J-S09009-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LEVI LEE EVANS | : | |
| | : | |
| Appellant | : | No. 1050 WDA 2022 |

Appeal from the Judgment of Sentence Entered February 28, 2022
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0001345-2018

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED:  May 25, 2023**

Appellant, Levi Lee Evans, appeals from the aggregate judgment of sentence of six to twelve years' incarceration, followed by two years' probation, imposed after he was convicted of rape of an unconscious person, 18 Pa.C.S. § 3121(a)(3), conspiracy to commit rape of an unconscious person, 18 Pa.C.S. § 903(a), indecent assault (without consent), 18 Pa.C.S. § 3126(a)(1), and possession with intent to deliver a controlled substance, 35 P.S. § 780-113(a)(3).  Appellant challenges the sufficiency and weight of the evidence to sustain his sex-offense convictions.  After careful review, we affirm.

The trial court set forth a lengthy summary of the evidence presented at Appellant's non-jury trial, as follows:

> The instant case arises out of an investigation of sexual assaults of [E.M.] and [K.S.] on January 18, 2018[,] in Greensburg, Westmoreland County.  The evidence presented at a non[-]jury

trial established that Patrolman Justin Scalzo, of the City of Greensburg Police Department, received a call to respond to the Autumn Brook Apartments for a possible sexual assault. (Non-Jury Trial Transcript [(]"[N.T. Trial,")] 9/14/21[,] at 11). Upon arrival, Patrolman Scalzo stated that he was met by [E.M.] and [K.S.] who relayed that they were victims of a sexual assault that occurred the night and morning prior to Patrolman Scalzo's arrival. ([*Id.*] at 11-12). According to Patrolman Scalzo, the victims identified Benjamin Davis and [Appellant] as the individuals accused of committing these assaults. ([*Id.*] at 12). Patrolman Scalzo testified that [E.M.] explained [that] she, [K.S.], Mr. Davis, and [Appellant] were at her apartment hanging out and using marijuana when she was given a drink which caused her to blackout and[,] during that time, she felt as though she was a victim of sexual assault. ([*Id.*]…). According to Patrolman Scalzo, [K.S.] reported a similar experience of alleged sexual abuse. ([*Id.*] at 12-14). Patrolman Scalzo described [E.M.] as being "very emotional" and "very much shaken[."] ([*Id.*] at 12-13). Patrolman Scalzo testified that [E.M.] was crying, vomiting in the bathroom, and had "a look of maybe a traumatic experience upon her face." ([*Id.*]…). According to Patrolman Scalzo, [K.S.] was "very withdrawn" and "had a worrisome and traumatic look on her face" as well. ([*Id.*] at 13). Pursuant to his investigation, Patrolman Scalzo indicated that he secured two used condoms, two empty condom wrappers, and clothing items belonging to the victims. ([*Id.*] at 14). Patrolman Scalzo stated that after speaking with the victims, he suggested that they both go to the hospital to have a rape kit conducted, and he accompanied them to the hospital for that purpose. ([*Id.*] at 14-15).

Patrolman Scalzo testified that he did not detect "any type of large odor of an alcoholic beverage" from the victims which would suggest that they were "completely blacked-out drunk[."] ([*Id.*] at 17). However, Patrolman Scalzo indicated that the victims had a "drowsy appearance, which I, kind of, looked at it that they had possibly had something slipped into a drink and drugged." ([*Id.*]…). The parties stipulated that none of the analyses of the blood and/or urine samples given at the hospital by the victims on the following day[,] nor any of the drinks collected from [E.M.'s] residence[,] contained any identifiable date-rape drug. ([*Id.*] at 16, 18-19).

[E.M.] testified that in January of 2018, she was living at the Autumn Brook Apartments in Greensburg. ([*Id.*] at 22). [E.M.] indicated that on January 17, 2018, she had plans to hang out

with [K.S.], who was a really good friend of hers, and [K.S.] invited Benjamin Davis and [Appellant]. ([*Id.*] at 22-24). [E.M.] testified that she met Mr. Davis, who she knew as "Spen Ben" and [Appellant], who she knew as "Tampa[,]" approximately two weeks prior to the incident through [K.S.], and she interacted with them a little bit over Facebook and met [them] once or twice. ([*Id.*] at 23-24). [E.M.] testified that she spoke to Mr. Davis on Facebook prior to the incident, and she told him that she was not interested in engaging in sex. ([*Id.*] at 24).

Text message exchanges between [E.M.] and Mr. Davis were admitted as Commonwealth's Exhibit One. [E.M.'s] message to Mr. Davis indicated that, "I ain't looking for dick[."] ([*Id.*] at 28). [E.M.] explained that she meant, "I wasn't looking to be sexual with anybody, but I was just pretty much trying to hang out as friends." ([*Id.*]…). A message from [E.M.] two days prior to the incident stated, "I'm just bluntly putting it out there for all cuz I'm tired of people thinking I need dicked down." ([*Id.*] at 29).

On the night of the incident, [E.M.] testified that she and [K.S.] met Mr. Davis and [Appellant] at the Sunoco on Mount Pleasant Road between 9:00 and 10:00 p.m.[,] and drove them to Sheetz before driving back to [E.M.'s] apartment at around 11:00 p.m. ([*Id.*] at 29-31). Once back at her apartment, [E.M.] indicated that they ate their food and smoked marijuana in her bedroom. ([*Id.*] at 31). [E.M.] stated that she had smoked marijuana prior to this incident, and she confirmed that she was familiar with the sensation that marijuana gave her and the effects it had on her body. ([*Id.*] at 33). [E.M.] stated that she ended up falling asleep while smoking which was uncommon for her, and when she was woken up, she "didn't feel right" — "I didn't feel like I could move." ([*Id.*] at 33-34). [E.M.] testified that she was wearing a pair of shorts and a shirt when she fell asleep. ([*Id.*] at 34). Subsequently, [E.M.] indicated that she was woken up on the other side of her bed to someone penetrating … her vagina and a figure standing behind her, who[m] she believed to be Mr. Davis. ([*Id.*] at 35-36). [E.M.] testified that she ended up falling back asleep and was awoken to another figure with dreadlocks, who[m] she believed to be [Appellant] behind her, penetrating her in her vagina. ([*Id.*] at 38-39). [E.M.] stated that she was not fully conscious, and she could not move or scream during these encounters. ([*Id.*] at 37-38). Additionally, [E.M.] testified that she was unable to move her body, roll over, or lift her arms. ([*Id.*] at 38). Once again, [E.M.] indicated that she was unable to move or speak, and after being conscious for no more than 20 seconds,

she fell back asleep. ([*Id.*] at 39-40). During these encounters, [E.M.] testified that [K.S.] was asleep next to her in her bed. ([*Id.*] at 39-40).

[E.M.] stated that she awoke in the morning in the living room where she was lying naked on a futon with Mr. Davis behind her. ([*Id.*] at 40-41). [E.M.] testified that she was freaking out, she was extremely dizzy, and she went into the bathroom and began calling for [K.S]. ([*Id.*] at 41). [E.M.] indicated that [K.S.] eventually came into the bathroom and revealed that she found four used condoms on [E.M.'s] bedroom floor. ([*Id.*]…). [E.M.] testified that she was sick and throwing up. ([*Id.*] at 43). According to [E.M.], she and [K.S.] then drove Mr. Davis and [Appellant] to a different Sunoco. ([*Id.*]…). After dropping off Mr. Davis and [Appellant], [E.M.] indicated that she and [K.S.] sat in the hospital parking lot for a couple hours, and then went back to her apartment before calling the police. ([*Id.*]…). After the incident, [E.M.] sent Mr. Davis a Facebook message indicating the following:

> Since ya'll wanna treat me like a hoe when I told you I didn't want dicked down, don't ever hit me up, period. And then to act like nothing happened? I wasn't even fully awake, let alone know Tampa touched me. Be glad I ain't being petty. I got all DNA and condoms and messages.

(*See* Commonwealth's Exhibit 1; [N.T. Trial] at 46-47).

[E.M.] testified that after writing the above message, and while sitting outside the hospital, [Appellant] called her phone "trying to talk things out[."] ([*Id.*] at 45). [E.M.] indicated that she was … certain that she had never been to [Appellant's] residence prior to this incident. ([*Id.*] at 50).

[K.S.] confirmed that she has known [E.M.] for 12 or 13 years, she knew [Appellant] for approximately nine years, and she has known Mr. Davis for about 13 years. ([*Id.*] at 69-70). [K.S.] testified that on January 17th into the 18th of 2018, there were plans for her, [E.M.], Mr. Davis, and [Appellant] to get together at [E.M.'s] apartment to watch Netflix and smoke marijuana. ([*Id.*] at 71). [K.S.] stated that she messaged [Appellant] and [E.M.] messaged Mr. Davis that they "wanted no sexual activities happening" on the night of the incident. ([*Id.*] at 72). [K.S.] confirmed that she and [E.M.] picked up Mr. Davis and [Appellant] at approximately 10:00 pm to 11:00 pm, they traveled to Sheetz, and then went back to [E.M.'s] house after midnight. ([*Id.*]…).

- 4 -

Upon arrival back at [E.M.'s] apartment, [K.S.] testified that Mr. Davis rolled a blunt, [Appellant] broke up a pill, which she believed to be Xanax, and put it into the blunt, and the four of them smoked it. ([*Id.*] at 73-74). [K.S.] testified that she has smoked marijuana before and has used Xanax prior to the date of the incident, and she confirmed that she is familiar with the effects those drugs, both individually and together, have on her body. ([*Id.*] at 74). After smoking the marijuana, [K.S.] indicated that she fell asleep wearing clothing; however, [K.S.] testified that she was awoken to [Appellant] pulling her pants down and "tapping his penis on my butt[."] ([*Id.*] at 74-78). [K.S.] said she told [Appellant] no, and "he respected that and just moved on to [E.M.] with Ben[."] (*Id.* at 78). [K.S.] testified that at that point she was not able to move, and she observed [E.M.] on the bed next to her; however, her body was on the opposite side of the bed from where she fell asleep. ([*Id.*] at 78-79).

[K.S.] testified that she observed Mr. Davis next to [E.M.], who appeared to be sleeping, trying to take her clothes off; however, [K.S.'s] vision started to become blurred and her eyes shut. ([*Id.*] at 79). [K.S.] testified that she woke up again and saw both Mr. Davis and [Appellant] on top of [E.M.], and she heard [E.M.] telling them "no, to stop, and that she didn't want it[."] ([*Id.*] at 79-80). After waking up the next day, [K.S.] testified that only she and [Appellant] were in the bedroom at that time. ([*Id.*] at 80). [K.S.] indicated that she was still unalert and had difficulty walking, but she heard [E.M.] crying in the shower, and she asked [E.M.] what happened. ([*Id.*] at 81). After talking with [E.M.] and being informed that she was raped by both Mr. Davis and [Appellant] and in pain, [K.S.] testified that she told Mr. Davis and [Appellant] to get their belongings and told them that they were taking them home "because they did [E.M.] wrong[."] ([*Id.*]…). According to [K.S.], they dropped off Mr. Davis and [Appellant], waited in the hospital parking lot for two hours, and then returned back to [E.M.'s] apartment and called the police. ([*Id.*] at 82-83).

[K.S.] testified that during this time, she was texting back and forth with [Appellant] via Facebook. ([*Id.*] at 82-83). During the non[-]jury trial, the Commonwealth introduced screenshots of Facebook message exchanges between [K.S.] and [Appellant], whose name appeared as "Tellemboutdat[."] ([*Id.*] at 83-85; *See* Commonwealth's Exhibit Two.) Communication between [K.S.] and [Appellant] revealed that [K.S.] messaged, "O[h] God, I'm piss[ed] off cus shes crying cus y'all played her that's [weird

as fuck truth]." ([N.T. Trial] at 86-87). [Appellant] then responded "how[,"] to which [K.S.] replied, "[C]us u ain't asked her to fuck her, you just did." ([*Id.*] at 86…). [Appellant] replied, "[I]t looks like she cool wit it. U feel, fell asleep n left her now, datz that's weird as fuck truth." ([*Id.*]…). Additionally, the messages revealed that [Appellant] wrote, "[T]ell her I said my fault didn't think she cared." ([*Id.*] at … 87).

[Appellant] also elected to testify during the non[-]jury trial. [Appellant] stated that he first met [E.M.] through [K.S.], after New Year's of 2018, and they smoked marijuana. ([*Id.*] at 103-[]04). [Appellant] testified that prior to the incident, he and [E.M.] had sex three to four times, including at his residence. ([*Id.*] at 104). [Appellant] indicated that on the date of the incident, [K.S.] invited him over to [E.M.'s] apartment, and [K.S.] told him to invite a friend, and he invited Mr. Davis. ([*Id.*] at 105). [Appellant] testified as soon as they arrived back at [E.M.'s] apartment, the four of them went into [E.M.'s] bedroom and smoked a blunt that [Appellant] rolled. ([*Id.*] at 106-[]07). [Appellant] denied putting any Xanax into the blunt. ([*Id.*] at 106). [Appellant] testified that after they were done smoking weed, "[I] slapped my dick off [K.S.'s] butt[,"] and asked [K.S.] if she wanted to have sex, but [K.S.] said no. ([*Id.*] at 109, 115-[]16). [Appellant] claims that [K.S.] was not passed out at that time. ([*Id.*] at 116). According to [Appellant], while in the bedroom in the presence of Mr. Davis and [K.S.], he then asked [E.M.] if she wanted to have sex, and [E.M.] said she did not care. ([*Id.*] at 109-[]10). [Appellant] indicated that he then had consensual sex with [E.M.] while [K.S.] was lying on the bed next to her, and after he was finished, he observed [E.M.] get up and walk out of the room. ([*Id.*] at 110). [Appellant] testified that Mr. Davis was not in the room at this time. ([*Id.*] at 111). [Appellant] denied forcing [E.M.] in any way and denied that she was unconscious while he was having sex with her. ([*Id.*] at 112). [Appellant] indicated that he used a condom while having sex with [E.M.]. ([*Id.*] at 131).

[Appellant] initially testified that he never saw Mr. Davis have sex on the date of the incident; however, he later recanted and indicated that "I just remembered that the bed was shaking, so they probably could have been having sex[."] ([*Id.*] at 117, 136). [Appellant] later confirmed that he did observe Mr. Davis have sex with [E.M.]. ([*Id.*] at 142). On the following morning, [Appellant] indicated that all four of them smoked marijuana again[,] and then [E.M.] and [K.S.] dropped him and Mr. Davis back off. (*Id*

at 118-[]19). After they were dropped off, [Appellant] testified that he and [E.M.] were texting each other. ([*Id.*] at 119-[]20). [Appellant] denied conspiring with Mr. Davis to rape or sexually assault the victims. ([*Id.*] at 122). On cross-examination, [Appellant] testified that the reason why he and Mr. Davis were invited to [E.M.'s] apartment was to have sex and smoke. ([*Id.*] at 123-[]24). [Appellant] testified that while engaging in sex with [E.M.], he did not think [E.M.] "liked it" because she was not moaning and did not say anything during sex. (*Id.* at 133-[]36).

[Appellant's] mother, Stephanie Hudson[,] also testified at trial. Ms. Hudson testified that on a date prior to the date of the incident, [E.M.] was at Ms. Hudson's residence with [Appellant]. ([*Id.*] at 148). The parties made the following stipulations at the non[-]jury trial: If called as character witnesses for [Appellant], Westmoreland County Prison inmates Erza Grant, Jesse Lawson, and Elijah Vento would testify that [Appellant] had a reputation as a peaceful, law-abiding person in the community of Greensburg. ([*Id.*] at 154-[]60). The parties also stipulated that Mr. Grant had pending charges for attempting to murder three law enforcement officers in the City of New Kensington; Mr. Lawson had current pending charges for aggravated assault; and Mr. Vento had current pending charges for possession of a firearm and hindering apprehension. ([*Id.*]…).

Trial Court Opinion (TCO), 11/4/22, at 1-9.

Based on this evidence, the court convicted Appellant of the above-stated offenses. On February 29, 2022, the court sentenced him to the aggregate term set forth *supra*. Appellant filed a timely, post-sentence motion. After the court denied Appellant's post-sentence motion on September 9, 2022, Appellant filed a notice of appeal on September 13, 2022.[1] He thereafter complied with the trial court's order to file a Pa.R.A.P.

_____

[1] By order dated September 8, 2022, and entered on September 9, 2022, the trial court denied Appellant's post-sentence motion by operation of law. Pennsylvania Rule of Criminal Procedure 720(B)(3)(a) requires judges to decide post-sentence motions within 120 days of filing. If the judge fails to

1925(b) concise statement of errors complained of on appeal.  On November 4, 2022, the court filed its Rule 1925(a) opinion.  Herein, Appellant states two issues for our review:

> 1. Whether the Commonwealth produced sufficient evidence to convict … Appellant of indecent assault [(]without consent[)] when … Appellant's actions were *de minimus* [*sic*] and discontinued once consent was explicitly revoked?

---

decide the motion or grant an extension within that timeframe, the motion "shall be deemed denied by operation of law."  ***Id.***  When a post-sentence motion is denied by operation of law, the clerk of courts must enter an order "forthwith" on behalf of the court stating that the post-sentence motion is deemed denied.  Pa.R.Crim.P. 720(B)(3)(c).  This Court has previously held that a breakdown occurs when the clerk of courts fails to enter an order deeming a post-sentence motion denied by operation of law and notifying the defendant of the same.  ***See Commonwealth v. Perry***, 820 A.2d 734, 735 (Pa. Super. 2003).  When a trial court denies a post-sentence motion after the 120-day period and the appellant then appeals within 30 days of the date of that decision, this Court has found that the notice of appeal is timely.  ***See id.***; ***see also Commonwealth v. Braykovich***, 664 A.2d 133 (Pa. Super. 1995) (holding that the appellant's notice of appeal, filed within 30 days of the untimely order denying post-sentence motion, was timely).

Appellant filed a timely post-sentence motion within 10 days of his judgment of sentence.  Pursuant to Rule 720(B)(3)(a), the trial court was required to decide the motion by July 5, 2022 — 120 days after the motion was filed.  The trial court did not decide the motion by that date, nor did Appellant ask for an extension of time for the trial court to decide the motion.  Accordingly, after 120 days passed, the clerk of courts was required to immediately enter an order denying the motion by operation of law.  The clerk of courts did not enter the appropriate order in this case.  The trial court eventually denied the post-sentence motion by operation of law on September 9, 2022.  Appellant filed a notice of appeal on September 13, 2022.  Pursuant to ***Perry***, we find that there was a breakdown in the operations of the court, and we allow the instant appeal to proceed, as Appellant's notice of appeal was filed within 30 days from the date that the order denying his post-sentence motion was entered on the docket.

2. Whether Appellant's convictions were against the weight of the evidence due to the conflicting and disparate testimony of the alleged victims and the lack of supporting physical evidence?

Appellant's Brief at 2 (unnecessary capitalization omitted).

Appellant first challenges the sufficiency of the evidence to sustain his conviction of indecent assault.

> "Whether the evidence was sufficient to sustain the charge presents a question of law." ***Commonwealth v. Toritto***, 67 A.3d 29 (Pa. Super. 2013) (*en banc*). Our standard of review is *de novo*, and our scope of review is plenary. ***Commonwealth v. Walls***, 144 A.3d 926 (Pa. Super. 2016). In conducting our inquiry, we examine[,]
>
>> whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, [is] sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence. For purposes of our review under these principles, we must review the entire record and consider all of the evidence introduced.
>
> ***Commonwealth v. Trinidad***, 96 A.3d 1031, 1038 (Pa. Super. 2014) (quotation omitted).

***Commonwealth v. Rojas-Rolon***, 256 A.3d 432, 436 (Pa. Super. 2021), *appeal denied*, 285 A.3d 879 (Pa. 2022).

Indecent assault (without consent) is defined as follows:

**(a) Offense defined.--**A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or

intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:

(1) the person does so without the complainant's consent;

18 Pa.C.S. § 3126(a)(1). "Indecent contact" is defined as, "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S. § 3101.

Appellant contends that this Court has too broadly construed the term "other intimate parts," resulting in "virtually any part of the human body" being included within that phrase. Appellant's Brief at 12 (citing **Commonwealth v. Fisher**, 47 A.3d 155, 158 (Pa. Super. 2012) (finding that the back of a person's legs fell within the definition of 'other intimate parts')). He maintains that it is therefore "unclear which parts of the human body are not 'intimate' for purposes of 18 Pa.C.S.[] § 3103." **Id.** Appellant further avers that the evidence was insufficient to support his indecent assault conviction because his "alleged conduct [was], at best, *de minimis* with respect to intimate contact[,]" and because there was "implied consent due to [his and E.M.'s] prior sexual history." **Id.** at 12-13.

Both these arguments are meritless. Initially, Appellant is correct that this Court has

interpreted the phrase "other intimate parts" to encompass more than sexual organs. For example, in [**Commonwealth v.**] **Capo**, [727 A.2d 1126, 1128 (Pa. Super. 1999), we] … interpreted "other intimate parts" to include the shoulders, neck, and back. Similarly, then-Judge, now Justice Wecht in **Fisher**, **supra**, opined that "[t]he backs of the legs can be intimate parts of the body, just as the shoulders, neck, and back were in **Capo**[]…." **Fisher**, 47 A.3d at 158; **see also** [**Commonwealth v.**] **Evans**, [901 A.2d

528, 533 (Pa. 2006)] (holding evidence was sufficient to convict defendant of indecent assault where defendant wrapped his arms around victim and inserted his tongue into victim's mouth because such act would not occur outside of sexual or intimate situation).

*Commonwealth v. Gamby*, 283 A.3d 298, 313 n.16 (Pa. 2022). Recently, in *Gamby*, our Supreme Court declined "to speak to whether the body parts at issue in these decisions are properly considered 'intimate parts....'" *Id.* However, the Court adopted our general interpretation of the phrase, explaining that "other intimate parts" is

> not limited to only sexual body parts, but rather, was also intended to mean a body part that is personal and private, and which the person ordinarily allows to be touched only by people with whom the person has a close personal relationship, and one which is commonly associated with sexual relations or intimacy.

*Id.* at 313-14 (footnotes omitted).

Under the definition set forth in *Gamby*, we have no trouble concluding that the victim's bare buttocks is a 'sexual or other intimate part' as contemplated by the indecent assault statute. The buttocks is unquestionably a part of one's body that is ordinarily touched only by people with whom one has a close personal relationship, and it is commonly associated with intimacy. Indeed, this Court has suggested that one's buttocks is a sexual or intimate part of one's body comparable to one's genitalia or breasts. *See Commonwealth v. Haahs*, 289 A.3d 100, 104 (Pa. Super. 2022) ("While [the] phrase[, 'sexual or other intimate parts,'] is not statutorily defined, this Court has not limited its meaning to a person's genitalia, buttocks or breasts for indecent assault."). Consequently, the evidence was sufficient to show

that Appellant's act of touching the victim's bare buttocks with his penis constituted contact with a 'sexual or other intimate part' of the victim's body.

We also reject Appellant's argument that indecent contact must be more than '*de minimis*' to constitute indecent assault, and his assertion that a victim can impliedly consent to contact simply by having had prior sexual relations with her attacker. Notably, Appellant cites no legal authority to support either of these claims. In any event, K.S. testified that Appellant's "tapping his penis on [her] butt" woke her from sleep. N.T. Trial at 76. We disagree that such contact was '*de minimis*.' We also disagree that the sleeping victim impliedly consented to this sort of intimate touching simply because she had allegedly had sexual contact with Appellant on prior occasions. This is especially true where the evidence demonstrated that K.S. told Appellant before the incident that she "wanted no sexual activities happening" that night. *Id.* at 71-72. Thus, the evidence was sufficient to sustain Appellant's conviction of indecent assault.

Next, Appellant challenges the weight of the evidence to sustain his sex-offense convictions. He avers:

> In many respects, [] Appellant's accuser's testimony was so inconsistent it calls into question whether the crimes in question occurred. [E.M.] testified she awoke to [] Appellant behind her, penetrating her vagina with what she believed to be his penis. [N.T. Trial] at 39. She later recounted that she was not certain the individual behind her was [] Appellant and she was unsure whether his penis was being used to penetrate her vagina. *Id.* at 58-59. This testimony alone should be sufficient to vacate [] Appellant's conviction for Rape of an Unconscious Victim[,] as [E.M.] could neither identify [] Appellant as the perpetrator or

confirm he was, in fact, engaging in sexual intercourse with her. *See* 18 Pa.C.S.[] § 3121(a)(3) (providing [that] a rape is committed when a person engages in sexual intercourse with a complainant). To make matters more shocking to the court's conscience, [E.M.] later admitted [that] she had previously testified at a [Protection From Abuse (PFA)] hearing [that] she could not recall the events of this incident at all. *Id.* 52-53. Not only was [E.M.'s] testimony internally inconsistent, it is admittedly inconsistent with her prior testimony under oath.

[K.S.'s] testimony only sways the weight of the evidence further in the direction of [] Appellant['s] being convicted of offenses he did not commit. [K.S.] claimed she woke up and saw both Davis and [Appellant] standing over [E.M.], who was saying she didn't want it. *Id.* at 79-80. This testimony runs counter to [E.M.'s] own statements, where she noted she could neither move nor speak during the assault. *Id.* at 36-38. [K.S.] went further in vividly describing [E.M.'s] legs being in the air with someone between them. *Id.* at 80. Again, this testimony was contradicted by [E.M.], who stated she was penetrated from behind. *Id.* at 35, 39. Nevertheless, [K.S.] testified she never saw [] Appellant having sex with [E.M]. *Id.* at 97.

Given the plain contradictions in testimony by the alleged victims, the convictions against [] Appellant should be vacated for shocking the court's sense of justice. When these apparent discrepancies are viewed in conjunction with the lack of physical evidence, justice is further wounded. Both alleged victims submitted saliva samples, blood draws for drug screening, and submitted rape kits. *Id.* at 82. In contradiction to their testimony, both individuals tested negative for the presence of any date-rape drugs. *Id.* at 18. All drinks found at the scene also tested negative for the same. *Id.* at 19.

Recall, testimony was given that all four of the individuals in this matter consumed the same drugs at the same time, with the drugs seemingly only having an incapacitating effect on the females. *See* [*id.*] at 33, 73. The chief mystery in this matter is how both women became incapacitated after sharing the same drugs with the two perpetrators who appeared to suffer no ill-effects. When examined in light of the lack of date-rape drugs in either's system, it becomes apparent that the testimony regarding their unconsciousness should be granted virtually no weight. The issues regarding physical evidence, in conjunction with the inconsistent testimony cannot be overlooked. As such, []

Appellant should be granted a new trial[,] as all of his convictions appear to be against the weight of the evidence.

Appellant's Brief at 14-17.

Appellant's arguments are unconvincing. Initially, he claims that certain inconsistencies in E.M.'s and K.S.'s testimony cast doubt on whether he actually had sexual intercourse with E.M., yet he himself admitted at trial that he had sex with E.M. ***See*** N.T. Trial at 109, 115-16.[2] Thus, the question for the trial court, sitting as the fact-finder, was whether that sexual intercourse – and Appellant's contact with K.S., which he also admitted, ***see id.*** – was consensual. While Appellant insists that the court should have discredited the victims' claims that they did not consent due to the inconsistencies in their testimony and the lack of physical evidence to corroborate their claims, the trial court disagreed. It explained:

In the present case, this [c]ourt had the opportunity to hear and see the evidence presented and to assess the credibility of the witnesses. The [c]ourt finds that the entirety of the evidence presented at trial convinces the [c]ourt that the evidence was in support of the verdict rendered. Through the duration of the non-

---

[2] Appellant also misconstrues E.M.'s testimony about her statements during a PFA hearing. During cross-examination, E.M. was asked if she remembered "testifying at a PFA hearing in this case … on February 26, 2018[,]" to which E.M. replied, "Yes." N.T. Trial at 52. E.M. was then asked if she would agree that, "at that time, [she] testified that [she] had no recollection of the incident." ***Id.*** E.M. explained what she meant by that testimony, stating: "Meaning there [were] parts of the rape that I was not aware, like, of what had happened. There [were] times that I was not awake." ***Id.*** Inquiring further, defense counsel then asked E.M. if she meant that "there are bits and pieces that you have no recollection of?" ***Id.*** at 53. E.M. responded, "Yes. I don't know what happened when I was not awake." ***Id.*** Based on E.M.'s explanation, we do not discern any significant discrepancies between her PFA hearing testimony and her testimony at Appellant's trial.

jury trial, the [c]ourt considered the following evidence: the testimony from [E.M.] … that she was penetrated by both Mr. Davis and [Appellant] at a time where she was unable to move or talk; the testimony of [K.S.] … that Mr. Davis and [Appellant] were on top of [E.M.] and she heard [E.M.] telling them "no, to stop, and that she didn't want it"; the testimony of [Appellant] … that he had sex with [E.M.] while using a condom and he did not think [E.M.] "liked it" because she was not moaning and did not say anything during sex; the message from [Appellant] to [K.S.] indicating, "[I]t looks like she cool wit it" and "[T]ell her I said my fault didn't think she cared"; the message from [E.M.] to Mr. Davis two days prior to the incident saying that "I ain't looking for dick" and "I'm tired of people thinking I need dicked down"; the message from [E.M.] after the incident saying[,] "since y'all want to treat me like a hoe when I told you I didn't want dicked down, don't ever hit me up"; the message from [Appellant] purportedly blaming [K.S.] for falling asleep and leaving [E.M.]; the testimony of [Appellant] … that he saw Mr. Davis having sex with [E.M.]; the testimony of [Appellant] … that the reason why he and Mr. Davis were invited to [E.M.'s] residence was to have sex and smoke; the testimony of Officer Scalzo [regarding E.M.'s] emotional state following the incident; the testimony of Officer Scalzo … that he located two used condoms on [E.M.'s] bedroom floor; the testimony of [K.S.] … that she was awoken to [Appellant's] pulling her pants down and tapping his penis against her bare butt asking her to have sex; the testimony of [K.S.] … that she said no, but she was not able to move at that time, and [Appellant's] testimony … that[,] "[I] slapped my dick off [K.S.'s] ass" and [that he] asked [K.S.] if she wanted to have sex, and she said no.

Despite minor inconsistencies, the [c]ourt finds the testimony of [E.M.] and [K.S.] to be credible and corroborated. Based upon this [c]ourt's review of the entire record, this [c]ourt does not find that the verdicts are inconsistent or so contrary to the evidence as to shock this [c]ourt's sense of justice.

TCO at 12-13.

We discern no abuse of discretion in the court's decision. We have held that "the lack of corroborating physical evidence does not undermine the victim's testimony" when deemed credible by the fact-finder. *Commonwealth v. Diaz*, 152 A.3d 1040, 1047 (Pa. Super. 2016). Indeed,

"[t]his Court has long-recognized that the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses." ***Id.*** (citing ***Commonwealth v. Charlton***, 902 A.2d 554, 562 (Pa. Super. 2006) (citation and internal punctuation omitted)). Here, there was no dispute that Appellant had sexual intercourse with E.M., and that he touched his penis to K.S.'s bare buttocks. The court found credible the victims' testimony that they did not consent to this contact, during which they were unconscious or semi-conscious. We agree with the Commonwealth that there was no "ill-will, bias, or prejudice present during the process of the non-jury trial[,] nor was there a misapplication of law or manifestly unreasonable exercise of judg[ment]" by the trial court. Commonwealth's Brief at 18. Rather, "[t]he [court] properly used [its] discretion to weigh the evidence and determine the credibility of each witness's testimony." ***Id.*** Accordingly, the trial court did not abuse its discretion in denying Appellant's challenge to the weight of the evidence to sustain his convictions.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/25/2023